STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. M. C. JACKSON AND ALFRED RAVENELL, DEFENDANTS-APPELLANTS.

Argued May 18, 1964—Decided July 31, 1964.

152

*Mr. John R. Tozzi* argued the cause for appellant M. C. Jackson (*Mr. Irving M. Hirsh,* of counsel and on the brief).

*Mr. Calvin J. Hurd* argued the cause for appellant Alfred Ravenell (*Mr. Alfred M. Wolin,* of counsel).

*Mr. Ralph DeVita,* Assistant Prosecutor, argued the cause for respondent (*Mr. H. Douglas Stine,* Union County Prosecutor, attorney; *Mr. S. David Levy,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

JACOBS, J. The defendants were found guilty of murder in the first degree and were sentenced to death. They appealed to this Court as of right. *R. R.* 1:2–1(c).

On June 5, 1962 the deceased Karl Teitelbaum was brutally murdered in Elizabeth. On July 20, 1962 Barbara Jean Jeter reported to the Elizabeth police that she knew who had committed the murder. She signed a verified statement implicating the defendants Jackson and Ravenell as well as Wallace Solomon Odom. During the early morning hours of July 21, 1962 Jackson, Ravenell and Odom were taken into custody and were then questioned. Jackson and Odom signed statements which implicated Ravenell as well as themselves. Ravenell did not sign any statement and denied all knowledge.

On July 23, 1962 a municipal court complaint was issued charging Jackson, Ravenell and Odom with having willfully, feloniously and with malice aforethought, killed and murdered Karl Teitelbaum, contrary to *N. J. S.* 2A:113–1. A preliminary hearing in the municipal court was adjourned to August 9, 1962 to afford the defendants an opportunity to retain counsel. On July 24, 1962 the Union County Grand Jury returned a murder indictment against Jackson, Ravenell and Odom and thereafter they appeared before county court judges. They requested that counsel be assigned to them and this was done by order dated August 21, 1962. In the meantime, pleas of not guilty were entered on their behalf.

Thereafter their counsel made various motions including motions for change of venue or foreign jury and motions for severance which were denied.

At the commencement of the trial certain jurors were sworn and permitted to remain despite objections by the defendants. The State then introduced its testimony in support of its charge that the three defendants had participated in the robbery of Teitelbaum during the course of which he was killed. Its primary witness was Barbara Jean Jeter who testified on direct examination that she knew the three defendants and Jackson had been her boyfriend; on June 5, 1962 she was in Teitelbaum's office when she and Teitelbaum heard noises and she followed him downstairs when he went there to investigate; she saw Jackson and heard Teitelbaum ask him to leave; she saw Teitelbaum grab his stomach and stoop over and run out the door with Jackson and Ravenell running after him; she also ran out the door and saw Jackson and Ravenell leaping on Teitelbaum; and then Odom grabbed and punched her and took her to Ravenell's car. Barbara also testified on direct examination that she was with the three defendants when one of them told her she was in this as deep as they were and Jackson gave her $15 saying that Teitelbaum was a hard man to kill and he had gotten about a hundred dollars from him. She was examined and cross-examined at great length and counsel for the defendants, though recognizing that her credibility was for the jury to determine, point to conflicts in her testimony and attack her reliability as a witness.

There was extensive testimony with respect to the voluntariness of the statements signed by Jackson and Odom. Detective Lynes testified that he along with Detective Schlauch interrogated Jackson while Detective Martel did the typing. Detective Lynes denied that Jackson was at any time threatened or coerced or that Jackson was handcuffed while he was being questioned. Jackson testified to the contrary, stating that he was handcuffed and that he signed the statement because of threats that he would be strapped to the

chair and beaten. The trial court disbelieved Jackson's assertions and found that his statement was voluntary and admissible in evidence as against him. At that point counsel for Ravenell unsuccessfully moved for a severance on the ground that since Jackson's statement had named Ravenell as the one who repeatedly stabbed Teitelbaum, no limiting instructions could efface the prejudice to Ravenell resulting from the admission of the statement as against Jackson. Odom's statement was also found by the trial court to be voluntary and was admitted in evidence as against him. In it he stated that Barbara, Jackson, Ravenell and he had talked about robbing Teitelbaum; he saw Jackson and Ravenell go into the building; and later he saw Barbara when she came running out and Ravenell and Jackson when they struck at Teitelbaum.

At the close of the State's case the three defendants moved for acquittal and their motions were denied. Ravenell did not testify on his own behalf but did introduce testimony by other witnesses to establish that he was elsewhere and not at the scene of the crime on June 5, 1962. Jackson did testify and denied any participation in or knowledge of the crime; he and others, including members of his family, testified that he was at home at the time it was committed. Odom testified that Barbara had suggested to Jackson, Ravenell and him that they rob Teitelbaum and that later he went with Ravenell and Jackson to the premises. He testified further that he then "got a bad feeling inside," "didn't want to have nothing to do with trying to take the man's money" and "went across the street to the tavern."

After the defendants had rested their case the State introduced testimony from several rebuttal witnesses including Detective Lynes. His testimony reiterated his earlier denial that he had threatened Jackson. Counsel for Jackson moved to strike this testimony on the ground that it was improper to select this particular testimony for emphasis shortly before summations. His motion was denied by the trial court. After the State had completed its rebuttal testimony the defendants moved for acquittal and their motions were denied. Follow-

ing summations, the trial court charged the jury which later returned verdicts of guilty of murder in the first degree against Jackson and Ravenell and a verdict of not guilty in favor of Odom. In support of their appeals to this Court, Jackson and Ravenell assert that there were serious legal errors which call for a new trial. In addition, Ravenell urges that he was entitled to an acquittal at the end of the State's case and Jackson urges that the verdict as to him was against the weight of the evidence. We agree that there were serious trial errors, particularly in the selection of the jury, and that they call for a new trial; they are dealt with later in this opinion. We find no basis for the contention that acquittal should have been directed either at the end of the State's case or the entire case, or that either of the guilty verdicts was against the weight of the evidence.

Under the cases, Ravenell's motion for acquittal at the end of the State's case is to be tested in the light of the evidence at that time without reference to any corroborative evidence introduced during the defendants' case; but the testing is to be done in conformity with the rule that the State is entitled to the benefit of all of its favorable testimony and the favorable inferences which a jury might reasonably draw therefrom. See *State v. Fiorello,* 36 *N. J.* 80, 86–87 (1961), *cert.* denied 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed. 2d* 396 (1962). Barbara's testimony, when coupled with the death and the attendant circumstances, was clearly enough to compel denial of the motion for acquittal. A jury could readily find that Ravenell and Jackson had attacked and robbed Teitelbaum and that during the course of the robbery Teitelbaum was repeatedly stabbed by a knife or other sharp instrument and died as a result. Barbara identified Ravenell and Jackson as the attackers and testified that after the attack she was in a car with Ravenell, Jackson and Odom when Jackson said he had gotten about $100 from Teitelbaum. Ravenell's counsel contends that the statement as to the $100 was inadmissible as against Ravenell but we consider it evidential against him as well as Jackson. It was part of the continuing

transaction in which, according to Barbara's testimony, both Jackson and Ravenell were participating and as such was substantive evidence in support of the State's contention that they were jointly engaged in a robbery. *Cf.* 2 *Wharton, Criminal Evidence* § 431, *p.* 205 (*12th ed.* 1955). Jackson's counsel attacks the truth of Barbara's testimony and urges that the jury's finding that Jackson was guilty was against the weight of the evidence. Jackson's confession gives support to her testimony but, even apart from it, the credibility of Barbara's testimony was a matter for the jury rather than this Court. See *State v. Landeros,* 20 *N. J.* 76, 84 (1955); *State v. Walker,* 37 *N. J.* 208, 219, *cert.* denied 371 *U. S.* 850, 83 *S. Ct.* 89, 9 *L. Ed. 2d* 86 (1962).

■■ Though the evidence for conviction may be deemed legally sufficient, the defendants were nonetheless entitled to a trial which was fair and free from prejudicial error. See *State v. Orecchio,* 16 *N. J.* 125, 129 (1954); *cf. Rideau v. Louisiana,* 373 *U. S.* 723, 83 *S. Ct.* 1417, 10 *L. Ed. 2d* 663 (1963). As we said in *Orecchio,* the sound administration of justice dictates that the means as well as the ends be just; where serious trial error has undermined the proceeding, there must be reversal without regard to our own views as to guilt. 16 *N. J.,* at *p.* 129; *Weiler v. United States,* 323 *U. S.* 606, 611, 65 *S. Ct.* 548, 89 *L. Ed.* 495, 499 (1945). This is particularly true where, as here, lives are at stake and stricter appellate approaches are warranted. See *State v. Mount,* 30 *N. J.* 195, 213 (1959); *State v. Wynn,* 21 *N. J.* 264, 271 (1956).

During the selection of the jury, Mr. Yoemans, a prospective juror, was challenged for cause on the ground that he was related to a captain in the Elizabeth police department and to the Sheriff of Union County. The challenge was first overruled, Mr. Yoemans was sworn as a juror, and since he was the fourteenth juror chosen, the jury was then sequestered in accordance with *R. R.* 3:7-2(f). Upon the sequestration, the trial court adjourned for the day and during the evening reconsidered its ruling and concluded that Mr. Yoemans

should be excused. It so announced on the following morning and thereafter Mr. Carolan was called as a prospective juror to replace Mr. Yoemans. When the trial court asked Mr. Carolan whether he was personally acquainted with or had any relatives who are law enforcement officers such as policemen he answered in the negative. On further interrogation he stated that he knew Deputy Chief Mulkeen, Captain Brugger, Detective Lynes and others in the Elizabeth police department. Indeed it then appeared that some of them were neighbors and friends with whom he had grown up and gone to church. Insofar as Detective Lynes was concerned, Mr. Carolan testified that he had known him for about twenty years and regarded him "as a close friend." Despite this, Mr. Carolan stated that if Detective Lynes contradicted the testimony of another witness he would not, because of the friendship, incline towards giving credence to his testimony.

At the close of Mr. Carolan's interrogation he was challenged for cause (the defendants' peremptory challenges had all been exhausted). Counsel for Ravenell stressed that the interrogation left serious doubts as to the prospective juror's ability to render a fair and impartial verdict and that he should be excused for cause. The trial court declined to excuse him, he was sworn as a juror and he participated throughout the trial and in the rendering of the verdicts of guilty. Counsel for Ravenell and Jackson now urge that the court's refusal to excuse Mr. Carolan for cause was erroneous and we agree. There was a time in early English history when jurors were men of the neighborhood who were called in to state the facts as they knew them. They were, in reality, witnesses. But by the fifteenth century this approach was abandoned and jurors have since been selected to hear witnesses presented by the parties and to decide on the basis of the testimony given by the witnesses. The jurors must be carefully selected with an eye towards their ability to determine the controverted issues fairly and impartially; in the words of Justice Blandin in *State v. White,* 105 *N. H.* 159, 196 *A. 2d* 33, 34 (1963), the trial court should see to it that the jury is

as nearly impartial "as the lot of humanity will admit." See 1 *Hyatt, Trials* § 687, *p.* 711 (1924) ; *cf. Wright v. Bernstein,* 23 *N. J.* 284 (1957), where, in a civil case for damages, Justice Oliphant made the following comments which have even greater pertinence in this capital case:

"The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. The jury is an integral part of the court for the administration of justice and on elementary principles its verdict must be obedient to the court's charge based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. The parties to the action are entitled to have each of the jurors who hears the case impartial, unprejudiced and free from improper influences. *Panko v. Flintkote Co.,* 7 *N. J.* 55, 61 (1951)." 23 *N. J.,* at *pp.* 294–295.

In *United States v. Chapman,* 158 *F. 2d* 417 (10 *Cir.* 1946), the Government instituted proceedings against Chapman to condemn land for the Denison Dam and Reservoir. Tomlinson, a prospective juror, stated to the trial court that he was an acquaintance of Chapman's and had testified as an expert in another condemnation case involving other land in the project. He nonetheless stated that he believed he could determine the issues freely and fairly to both the Government and Chapman. The Government's challenge for cause was overruled and Tomlinson participated as a juror. On appeal, the judgment for Chapman was reversed and a new trial was ordered. In the course of his opinion for reversal, Circuit Judge Murrah first pointed out that impartiality is not a technical concept and that a party's right to a fair and impartial trial is to be resolved in accordance with high standards of human conduct (158 *F. 2d,* at *p.* 419) ; he then went on to make the following comments:

"It is said that when a juror testifies that he believes he can, and the court finds as a matter of fact that he will, if selected, render an impartial verdict on the evidence, he is an impartial juror as required by the law. *Rice v. Emerson, supra* [181 *Okl.* 51, 72 *P. 2d* 498]. A juror's answer to questions touching his state of mind is primary evidence of his competency, but the ultimate question is a judicial one for the court to decide, and in case of doubt, justice demands that the chal-

lenge be allowed. *Scribner v. State*, 3 *Okl. Cr.* 601, 108 *P.* 422, 35 *L. R. A., N. S.*, 985; *Temple v. State*, 15 *Okl. Cr.* 176, 175 *P.* 733, 736; *Crawford v. United States*, 212 *U. S.* 183, 197, 29 *S. Ct.* 260, 53 *L. Ed.* 465, 15 *Ann. Cas.* 392; 31 *Amer. Juris., p.* 638. Only by a punctilious regard for a suspicion of prejudice can we hope to maintain the high traditions of our jury system. We must make sure that the lamentations of the unsuccessful litigant is without foundation, either in fact or circumstance." 158 *F.* 2d, at *p.* 421.

In *State v. Joiner,* 163 *La.* 609, 112 *So.* 503 (1927), the defendant, after a second trial, was found guilty of murder and was sentenced to death. On appeal he attacked the trial court's refusal to excuse a juror for cause. The juror was a friend of the deceased and of the state's witness. The juror had talked to the witness before the trial and had formed an initial opinion but stated that that would not influence him in weighing the testimony, that he would not believe a witness who was his personal friend more readily than he would believe a stranger, and that he could disregard his friendship for the witness and the deceased and give the defendant a truly fair and impartial trial. In reversing and ordering a new trial the Supreme Court of Louisiana, through Justice Rogers, pointed out that these statements by the juror "must be tested, like all other human testimony, according to the common knowledge, experience and observation of mankind." The Justice expressed the thought that the juror was not in any position to weigh the evidence of his friend against the evidence of strangers and of the defendant, accused of murdering his intimate friend, "so as to strike a balance between them such as the law requires." (112 *So.,* at *p.* 505.)

In *Johnson v. Reynolds,* 97 *Fla.* 591, 121 *So.* 793 (1929), a prospective juror first said his friendship with the attorney for the plaintiffs would embarrass him to render a verdict against them but later said he "would go into the jury and render a fair and impartial verdict according to the evidence and the evidence alone." After overruling the defendants' objection the trial court permitted him to serve as a juror. On appeal this action was held to constitute prejudicial error and the judgment which had been rendered for the plaintiffs

was reversed. The Florida Supreme Court noted that if there is question as to the juror's "sense of fairness or his mental integrity," he should be excused and that "[i]f error is to be committed, let it be in favor of the absolute impartiality and purity of the jurors" (121 *So.*, at *p.* 796). Similarly, in *State v. Mace*, 262 *Mo.* 143, 170 *S. W.* 1105 (1914), the court, while refusing review in the case before it because no proper challenge had been made at the trial, took pains to point out to prosecuting attorneys as well as trial judges that where there is doubt as to the prospective juror's competency or impartiality he should be permitted to stand aside so that a clearly qualified juror may take his place. 170 *S. W.*, at *p.* 1109. See also *Wilson v. State*, 243 *Ala.* 1, 8 *So.* 2d 422, 429–430 (1942) ; 31 *Am. Jur., Jury* § 150, *p.* 131 (1958).

▆▆ We, of course, recognize that the trial court is vested with broad discretionary powers in determining the qualifications of jurors and that its exercise of discretion will ordinarily not be disturbed on appeal. See *State v. Simmons*, 120 *N. J. L.* 85, 90 (*E. & A.* 1938). Nevertheless we are satisfied that, under the particular circumstances here, the refusal to excuse Mr. Carolan constituted error which impaired the right of the defendants to competent and impartial jurors. His close relationship with members of the Elizabeth police department, particularly Detective Lynes, suggests inability to deal with the evidence with the measure of impartiality required by the law. It must be borne in mind that Detective Lynes was an important State's witness whose credibility was under direct attack. Though Mr. Carolan may have been wholly sincere in his statement that his long and close friendship with Detective Lynes would have no bearing whatever on the issue of credibility, we find it difficult to accept for it runs counter to human nature. Surely the defendants were amply justified in refusing to accept it and when their objection to his serving was voiced in timely fashion it should have been honored, if for no other reason than to insure their confidence in the basic fairness of the trial. In any sound judicial system it is essential not only that justice be done but

also that it appear to be done. See Lord Hewart, C. J., in *Rex v. Sussex Justices* [1924] 1 *K. B.* 256, 259; Frankfurter, J., in *Offutt v. United States,* 348 *U. S.* 11, 14, 75 *S. Ct.* 11, 99 *L. Ed.* 11, 16 (1954); *Borough of Fanwood v. Rocco,* 33 *N. J.* 404, 417 (1960); *State v. Deutsch,* 34 *N. J.* 190, 206 (1961).

The defendants assert further error in the trial court's refusal to excuse juror Carl W. Bergel who participated throughout the trial and in the rendering of the verdicts. On his *voir dire* Mr. Bergel stated that he did not know any policemen. He was found acceptable as a juror and was sworn. Some days later but before the jury was completed, he advised the trial court that he had been mistaken in his answers and that in fact a first cousin of his was a member of the Elizabeth police force. At that point counsel for the defendants sought to exercise peremptory challenge (which had not yet been exhausted) stating that if the true facts had been originally disclosed by Mr. Bergel they would then have excused him. The trial court, citing *State v. Rios,* 17 *N. J.* 572 (1955), ruled that there could be no peremptory challenge since the juror had already been sworn. It also rejected the defendants' effort to challenge for cause on the ground that the juror had acted in good faith and his earlier failure to recollect was due to the fact that he was one of a large family and had not seen his cousin for years. *Cf. State v. Grillo,* 16 *N. J.* 103, 114–115 (1954).

In *Rios,* juror Nix was found acceptable and was sworn. Later, defense counsel sought to challenge him peremptorily. Unlike the case at hand there had been no misstatements, inadvertent or otherwise, on the juror's *voir dire,* and the effort to exercise the peremptory challenge evidently represented defense counsel's second thoughts. This Court, in an opinion by Justice Wachenfeld, held that the effort came too late, saying:

"Were we to sanction peremptory challenges after the swearing of the jurors, it would soon become standard practice for counsel to withhold their peremptory challenges until a full panel had been sworn, doubtlessly hoping thereby to gain the advantage of an observation

made after the entire panel had been selected. Such a procedure would lead to but further and needless delay in the selection of a jury and would not serve to advance the ends of justice." 17 *N. J.*, at *p.* 594.

 The reason stated by Justice Wachenfeld can have no application to the case at hand for here there was no deliberate withholding by defense counsel who sought to exercise peremptory challenge just as soon as the true facts were disclosed. Although the applicable court rule provides that a challenge to a juror must be made before he is sworn, it also provides that "the court for good cause shown may permit it to be made after he is sworn but before any evidence is presented." *R. R.* 3:7–2(b). The rule is, in terms, clearly broad enough to apply to both challenges for cause and peremptory challenges and although the opinion in *Rios* contains narrowing language, it must be read in its particular factual context. We know of no just reason which would warrant withdrawal from the trial court of the rule's discretionary power in the circumstances here. *Cf. People v. Durrant,* 116 *Cal.* 179, 48 *P.* 75, 78 (1897); *Brewer v. State,* 72 *Ark.* 145, 78 *S. W.* 773, 776 (1904); *State v. Rankins,* 211 *La.* 791, 30 *So.* 2*d* 837, 839 (1947). The defendants' right of rejection through the exercise of peremptory challenge was a valuable statutory incident to their right to trial by jury. See *N. J. S.* 2A:78–7; *Brown v. State,* 62 *N. J. L.* 666, 676–690 (*E. & A.* 1899). If the juror originally had answered truthfully, he would undoubtedly have been challenged peremptorily. When the truth did appear, the defendants immediately offered to exercise peremptory challenge, and since the presentation of evidence had not begun, the challenge could readily have been honored and the juror replaced without any disruption of the proceedings. The trial court's refusal to take such action constituted error cognizable on appeal. *Cf. Wright v. Bernstein, supra,* 23 *N. J.*, at *pp.* 293–297.

Shortly before the date set for trial, the defendants moved for bail under *State v. Konigsberg,* 33 *N. J.* 367 (1960), and for severance under *R. R.* 3:5–7. See *State v. Johnson,* 31 *N. J.* 489, 505 (1960); *State v. Rios, supra,* 17 *N. J.*, at *pp.*

583–586; cf. *Delli Paoli v. United States,* 352 U. S. 232, 242, 77 S. Ct. 294, 1 L. Ed. 2d 278, 285 (1957); *State v. Tassiello,* 39 N. J. 282, 296 (1963). The motions came after the cutoff date which had been set for such applications but the trial court did not rest its determination on untimeliness. Instead it took the position that the motions should be denied without hearing because of the danger of prejudice to the defendants which might flow from the publicity attending the hearing. As it was put below:

> "The Court does not see how it can avoid, in hearing these motions for severance at this late date, and the motions for bail, without affecting the constitutional rights of the defendants to a trial that is impartial, before an impartial court, before an impartial jury, and in the calm and serenity of a properly conducted legal proceedings.
>
> Not only does this situation go to the impartiality of the jurors, but it goes to the very calm and serenity of the proceedings to which these defendants are entitled to as a constitutional right, plus the additional constitutional right of a speedy trial, and this Court believes that it has the duty to interfere and step in wherever it feels a great prejudice can occur to the defendants regardless of the fact that the motions are brought by their own counsel, just as a court has a duty in a trial, where it can prevent, by conduct of any counsel, prejudice to either the State or the defendant.
>
> \* \* \* \* \* \* \* \*
>
> The issue, the basic issue being their guilt or innocence, under our great presumption that they are innocent until proven guilty by the State beyond a reasonable doubt, should not be interfered with. The Court at this time. accordingly will dismiss the motions for severance and for bail."

 When it was suggested that the court might exclude the press or at least restrict its reporting to the results of the motions, the trial court said it could find no authority for such action; and then it proceeded to note that it had thought of the advisability of hearing the motions in chambers but had concluded that since counsel, the defendants and others would have to be present it could not "crowd everybody into chambers." We consider that the trial court entertained too limited a view of its powers and that it should have heard the motions, in the courtroom or in larger chambers, taking such reasonable steps as were necessary to protect the defendants against

prejudice. These steps might well have included accession to any request by the defendants that the general public including the press be excluded. See *United Press Associations v. Valente,* 308 *N. Y.* 71, 123 *N. E.* 2d 777 (1954); *Geise v. United States,* 265 *F.* 2d 659 (9 *Cir.*), cert. denied 361 *U. S.* 842, 80 *S. Ct.* 94, 4 *L. Ed.* 2d 80 (1959); *cf. Kirstowsky v. Superior Court,* 143 *Cal. App.* 2d 745, 300 *P.* 2d 163, 168–169 (1956); but *cf. E. W. Scripps Company v. Fulton,* 100 *Ohio App.* 157, 125 *N. E.* 2d 896, appeal dismissed as moot 164 *Ohio St.* 261, 130 *N. E.* 2d 701 (1955). See also *State v. Genese,* 102 *N. J. L.* 134, 142 (*E. & A.* 1925); *Hayes v. United States,* 296 *F.* 2d 657, 668 (8 *Cir.* 1961), *cert.* denied 369 *U. S.* 867, 82 *S. Ct.* 1033, 8 *L. Ed.* 2d 85 (1962).

On the retrial of the defendants, the motion for bail will presumably not be renewed since the requirement of the showing of a capital offense where the proof is evident and the presumption great, is readily satisfied. See *State v. Konigsberg, supra,* 33 *N. J.* 367. However, the motion for severance might well be renewed and in that event the trial court will be called upon to exercise its discretion under *R. R.* 3:5–7. The defendants have not challenged the principles implicit in *R. R.* 3:5–7 nor have they suggested that they be replaced in favor of the dissenting approach in *Delli Paoli v. United States, supra,* 352 *U. S.,* at *p.* 246, 77 *S. Ct.,* at *p.* 294, 1 *L. Ed.* 2d, at *p.* 288, an approach which, though of considerable persuasion, would decimate joint trials. They have, however, urged that under the special circumstances here, the discretion contemplated by *R. R.* 3:5–7 should have been exercised in favor of severance. That may well be but we shall not at this stage direct the course to be taken at the retrial in the event there is a motion for severance; in passing on such motion the trial court will undoubtedly give conscientious consideration and due weight to the pertinent factors including the feasibility of trying the defendants separately, the nature of the State's charge and its evidence, and the fact that the defendant Jackson alone has signed a statement which, upon admission against him, must be effectively lim-

ited in the effort to avoid prejudice to his codefendant Ravenell. See *State v. Tassiello, supra,* 39 *N. J.,* at *pp.* 296–298; *State v. Hall,* 55 *N. J. Super.* 441, 451 *(App. Div.* 1959); *cf. People v. Feolo,* 282 *N. Y.* 276, 26 *N. E. 2d* 256 (1940); *Hale v. United States,* 25 *F. 2d* 430, 438 (8 *Cir.* 1928); *Annotation: Right to severance where codefendant has incriminated himself,* 54 *A. L. R. 2d* 830 (1957).

Both defendants Jackson and Ravenell contend that since they were afforded no preliminary hearing in the municipal court they were denied due process of law. The contention has no merit and should not be raised at the retrial. See *State v. Smith,* 32 *N. J.* 501, 536 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961); *State v. Kirkland,* 82 *N. J. Super.* 409, 413 *(App. Div.* 1964). When the municipal court complaint charging the defendants with murder was filed, the preliminary hearing was adjourned to afford the defendants an opportunity to retain counsel. In the meantime and before the adjourned date, the Union County Grand Jury returned an indictment charging the defendants with murder, as it had the undoubted right to do without awaiting the preliminary hearing. See *State v. Josephs,* 79 *N. J. Super.* 411, 415 *(App. Div.* 1963); *State v. War,* 38 *N. J. Super.* 201, 208 *(Passaic Cty. Ct.* 1955). From then on the complaint had no further purpose, there was no occasion for any hearing on it, and the defendants were in nowise prejudiced by the absence of the hearing. *Cf. R. R.* 3 :2–3; *R. R.* 8 :3–3; *State v. Kirkland, supra,* 82 *N. J. Super.,* at *p.* 414.

*Hamilton v. Alabama,* 368 *U. S.* 52, 82 *S. Ct.* 157, 7 *L. Ed. 2d* 114 (1961), upon which the defendants have placed reliance, has no application here. The defendant had no counsel at his arraignment in an Alabama court. Later he was assigned counsel who represented him at his trial which resulted in a verdict of guilty and sentence of death. The Supreme Court, finding that the arraignment was a critical stage in the Alabama proceeding because certain defenses were lost if not then raised, held that the defendant was entitled to relief.

In *White v. Maryland,* 373 *U. S.* 59, 83 *S. Ct.* 1050, 10 *L. Ed.* 2d 193 (1963), the defendant, while not yet represented by counsel, entered a plea of guilty to a capital offense at a hearing before a magistrate. At his trial evidence of the guilty plea was introduced by the state and he was found guilty and sentenced to death. In reversing, the Supreme Court pointed out that under the particular circumstances the proceeding before the magistrate was as critical as was the proceeding against Hamilton in Alabama. Unlike *Hamilton,* the defendants Jackson and Ravenell were not precluded, by omission of preliminary hearing in the municipal court (or for that matter by the absence of counsel in the municipal court), from any defenses or protective steps, and unlike *White,* they were not disadvantaged by pleas or inculpatory statements in the municipal court. In any event, while *Hamilton* and *White* called for setting aside the unlawful convictions, they did not call for indictment dismissal or preclude retrial. See *State v. Kirkland, supra,* 82 *N. J. Super.* 409. See also *United States ex rel. Cooper v. Reincke,* 333 *F.* 2d 608 (2 *Cir.* 1964); *In re DeToro,* 222 *F. Supp.* 621 (*D. Md.* 1963); *Thompson v. Warden of Maryland Penitentiary,* 233 *Md.* 643, 197 *A.* 2d 138 (1964); *State v. White,* 243 *S. Car.* 238, 133 *S. E.* 2d 320 (1963); *cf. Pointer v. State,* 375 *S. W.* 2d 293 (*Tex. Crim. App.* 1963).

The defendant Jackson has attacked the admissibility of his confession or inculpatory statement (*cf. Stewart v. State,* 232 *Md.* 318, 193 *A.* 2d 40, 43 (1963)) and the issue may appear again at the retrial. The principles applicable to the admission of a voluntary confession have been set forth in many of our recent cases. See *State v. Loray,* 41 *N. J.* 131, 136 (1963); *State v. Tassiello, supra,* 39 *N. J.,* at *p.* 291; *State v. Fauntleroy,* 36 *N. J.* 379, 395–398 (1962); *State v. Smith, supra,* 32 *N. J.,* at *pp.* 559–560; see also the recent decisions of the Supreme Court in *Escobedo v. Illinois,* 84 *S. Ct.* 1758, 12 *L. Ed.* 2d 977 (1964) and *Jackson v. Denno,* 84 *S. Ct.* 1774, 12 *L. Ed.* 2d 908 (1964). Before a confession obtained by the police from the defendant may be received in

evidence, the State must carry the burden of establishing that the defendant's will had not been overborne and that the fundamental fairness requirement of the due process clause had not been violated. Initially the trial judge must make his own finding as to whether the State has carried its burden and has established the voluntariness of the confession; and if he finds it to have been voluntary he must then instruct the jury to consider the same issue and to disregard the confession unless it finds that the State has proved it was made voluntarily. See *State v. LaPierre*, 39 *N. J.* 156, 162–163 (1963); *cf. Jackson v. Denno, supra*, 84 *S. Ct.* 1774, 12 *L. Ed. 2d* 908.

The defendant urges that notwithstanding any factual showing of voluntariness, a confession should be excluded when obtained from a defendant illegally detained in that he has been arrested but has not been taken without unnecessary delay before a magistrate as directed by *R. R.* 3:2–3(a). In *State v. Pierce*, 4 *N. J.* 252 (1950), it was held that while a confession obtained during illegal detention would be carefully scrutinized (and would not be admitted unless "it convincingly appears that it was in fact and in truth voluntarily made" (4 *N. J.*, at *p.* 264)), it would not be considered inadmissible *per se. Pierce* was followed in *State v. Wise*, 19 *N. J.* 59, 84 (1955), and *State v. LaPierre, supra*, 39 *N. J.*, at *p.* 171, which took cognizance of the fact that, in the exercise of its supervisory powers over the administration of criminal justice in the federal courts, the Supreme Court had reached an opposite result. See *McNabb v. United States*, 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819 (1943); *Mallory v. United States*, 354 *U. S.* 449, 77 *S. Ct.* 1356, 1 *L. Ed. 2d* 1479 (1957). In *LaPierre*, the defendant's request that New Jersey abandon its stand in favor of *McNabb-Mallory* was expressly rejected. That case was decided only last year and, there being no definitive Supreme Court ruling that *McNabb-Mallory* has attained constitutional dimensions, *LaPierre* will not now be departed from. See *State v. Shipley*, 232 *Or.* 354, 375 *P. 2d* 237 (1962), *cert.* denied 374 *U. S.* 811, 83 *S. Ct.* 1701, 10 *L. Ed. 2d* 1034 (1963); *People v.*

*Bush,* 29 *Ill. 2d* 367, 194 *N. E. 2d* 308 (1963); *State v. Lavallee,* 104 *N. H.* 443, 189 *A. 2d* 475 (1963); but *cf. Report, N. J. Supreme Court Committee on Evidence* 158–161 (1963); Broeder, "Wong Sun v. United States: A Study in Faith and Hope," 42 *Neb. L. Rev.* 483, 564 (1963); and compare the implications of *Escobedo v. Illinois, supra,* 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977.

The defendant contends that his arrest was illegal and that under *Wong Sun v. United States,* 371 *U. S.* 471, 83 *S. Ct.* 407, 9 *L. Ed. 2d* 441 (1963), and *Ker v. California,* 374 *U. S.* 23, 83 *S. Ct.* 1623, 10 *L. Ed. 2d* 726 (1963), a confession obtained during detention after an illegal arrest is inadmissible *per se.* In *Ker* the Court upheld a state conviction which rested on evidence seized in the course of an arrest without a warrant; the state court had found that the arrest was based on probable cause, that the entry into the defendants' apartment was not unlawful, and that the search was lawfully incident to the arrest. *Cf. State v. Doyle,* 42 *N. J.* 334 (1964). In the course of its opinion the Supreme Court announced that in applying *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961), state searches and seizures must meet federal constitutional standards of reasonableness. (374 *U. S.,* at *pp.* 30–34, 83 *S. Ct.,* at *p.* 1623, 10 *L. Ed. 2d,* at *pp.* 735–738.) In *Wong Sun* federal agents entered Toy's living quarters, arrested him, searched his premises, seized certain tangible objects, and took oral statements from him. The Supreme Court, in setting aside a federal conviction of Toy, held that the entry and arrest were unlawful since there was a lack of probable cause and that the oral statements as well as the tangible objects were inadmissible as fruits of the unlawfulness. The Court noted that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." 371 *U. S.,* at *pp.* 485–486, 83 *S. Ct.,* at *p.* 416, 9 *L. Ed. 2d,* at *p.* 454. In rejecting the Government's contention that Toy's state-

ments were admissible on the ground that, although they were closely consequent upon the unlawful entry, they were nevertheless evidential as an intervening independent act of free will, the Court noted that the particular circumstances rendered it "unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 *U. S.*, at *p.* 486, 83 *S. Ct.*, at *p.* 416, 9 *L. Ed. 2d*, at *p.* 454.

In *State v. Traub,* 151 *Conn.* 246, 196 *A. 2d* 755 (1963), the court noted that *Wong Sun* has not been interpreted as authority for the defendant's position that a confession following an illegal arrest is inadmissible *per se;* it found on the facts before it that Traub's arrest, though assumed to be illegal, was not an operative factor in causing or bringing about his confession which it determined to have been uncoerced and truly voluntary. Other decisions have expressed comparable views in reaching similar results. See *Commonwealth v. Palladino, Mass.,* 195 *N. E. 2d* 769 (1964); *Prescoe v. State,* 231 *Md.* 486, 191 *A. 2d* 226 (1963); *Stewart v. State, supra,* 232 *Md.* 318, 193 *A. 2d* 40; *Peal v. State,* 232 *Md.* 329, 193 *A. 2d* 53 (1963); *Hollingsworth v. United States,* 321 *F. 2d* 342, 351 (10 *Cir.* 1963); *United States v. Burke,* 215 *F. Supp.* 508, 511 (*D. Mass.* 1963); but *cf. Gatlin v. United States,* 326 *F. 2d* 666, 671–673 (*D. C. Cir.* 1963); *State v. Mercurio, R. I.,* 194 *A. 2d* 574 (1963). Although the defendant Jackson's arrest was made without an arrest warrant, it was not necessarily illegal because in the attendant circumstances Barbara's statement may have furnished the police with probable cause for the arrest within the principles expressed in *State v. Doyle, supra,* 42 *N. J.,* at *pp.* 345–346. *Cf. People v. Jackson,* 202 *Cal. App. 2d* 569, 21 *Cal. Rptr.* 44 (1962); *Hammitt v. Straley,* 338 *Mich.* 587, 61 *N. W. 2d* 641 (1953). The record at the retrial will undoubtedly shed light on this issue. Furthermore, assuming the arrest to have been illegal, the confession was not immediate and part and parcel of an oppressive and unlawful intrusion as in *Wong Sun,* and may perhaps have been freed of

taint and involuntariness within the New Jersey precedents and the cited cases construing *Wong Sun* (but *cf*. Broeder, *supra*, 42 *Neb. L. Rev.*, at *p*. 516 *et seq.;* see *Escobedo v. Illinois, supra*, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977) ; for present purposes we need do no more than reject the defendant Jackson's contention that if his arrest was illegal his later confession was necessarily involuntary and inadmissible in evidence. See *State v. Traub, supra; Prescoe v. State, supra; Commonwealth v. Palladino, supra.*

Both defendants Jackson and Ravenell have raised additional points of error which need not be dealt with here at any length. The denial of their motions for change of venue or foreign jury and the denial of the defendant Ravenell's motion for a jury view did not exceed the court's discretionary authority. See *State v. Wise, supra*, 19 *N. J.*, at *pp*. 73–74; *State v. King*, 133 *N. J. L.* 480, 483 (*Sup. Ct.* 1945), aff'd 135 *N. J. L.* 286 (*E. & A.* 1947). The remarks in the prosecutor's summation which are alleged to have been improper may not recur at the retrial and, in any event, were not beyond the outer bounds set forth in the cases. See *State v. Johnson, supra*, 31 *N. J.*, at *pp*. 510–512; *State v. Harris,* 70 *N. J. Super.* 9, 13 (*App. Div.* 1961). The attacks on the charge and supplemental charge lack merit and undoubtedly at the retrial the court's instructions will deal fully with the jury's functions relating to punishment as contemplated by *State v. Reynolds*, 41 *N. J.* 163, 189–198 (1963), *cert*. denied 84 *S. Ct.* 1934, 12 *L. Ed. 2d* 1050 (1964).

Reversed and remanded for new trial.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.