**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2334-15T4

SANGHAMITRA SENGUPTA and
ARIJIT SENGUPTA,

     Plaintiffs-Appellants,

v.

SAINT BARNABAS MEDICAL
CENTER, ALAN MARTINEZ, M.D.,
and SARAH LITTLE, M.D.,

     Defendants,

and

ROBERT TAYLOR, M.D.,

     Defendant-Respondent.

_____

Argued September 28, 2017 – Decided September 14, 2018

Before Judges Simonelli, Haas and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-0898-13.

Michael P. Mangan argued the cause for appellants (Mangan Ginsberg, LLP, attorneys; Michael P.

Mangan, of counsel and on the briefs; Christina M. Martinez, on the briefs).

Christine M. Jones argued the cause for respondent (Farkas & Donohue, LLC, attorneys; David C. Donohue, of counsel; Christine M. Jones, on the brief).

PER CURIAM

In this medical malpractice action, plaintiffs Sanghamitra and Arijit Sengupta, husband and wife, appeal from the December 29, 2015 Law Division order, entering judgment after a jury verdict in favor of defendant Robert Taylor, M.D. Plaintiffs also appeal from the February 5, 2016 order, denying their motion for a new trial. Because we conclude that the trial court mistakenly exercised its discretion by allowing a juror to serve after acknowledging a conflict of interest, we now reverse.

On January 31, 2013, plaintiffs filed a four-count complaint against defendants Taylor, Saint Barnabas Medical Center (Saint Barnabas), Alan Martinez, M.D., Sarah Little, M.D., and fictitious parties after Sanghamitra[1] underwent a total abdominal hysterectomy with bilateral salpingo-

_____

[1] We refer to plaintiffs by their first names to avoid any confusion caused by their common surname. We intend no disrespect.

oophorectomy[2] (TAH/BSO) performed by Taylor at Saint Barnabas. The complaint alleged medical malpractice, negligence, and lack of informed consent in Sanghamitra's diagnosis, treatment, and care. In count four of the complaint, Arijit claimed a loss of consortium.

With the exception of Taylor, all defendants were voluntarily dismissed prior to trial, which commenced with jury selection on December 1, 2015. According to the evidence presented at trial, Sanghamitra went to the Saint Barnabas emergency room on February 3, 2011, complaining of a number of symptoms, including heavy vaginal bleeding, abdominal pain, and cramping. She was admitted to Saint Barnabas later that day under the care of Taylor, a gynecologic oncologist, who ordered several tests.

Based on an ultrasound, blood tests, and other studies, Taylor suspected that Sanghamitra had cancer and recommended a TAH/BSO.[3] When he met

---

[2]  "In a total hysterectomy, the uterus and cervix are removed. In a total hysterectomy with salpingo-oophorectomy, (a) the uterus plus one (unilateral) ovary and fallopian tube are removed; or (b) the uterus plus both (bilateral) ovaries and fallopian tubes are removed." NCI Dictionary of Cancer Terms, Nat'l Cancer Inst. (last visited July 13, 2017), https://www.cancer.gov/publications/dictionaries/cancer-terms?cdrid=322852.

[3]  The ultrasound showed a "right-sided pelvic lesion" that could be an "exophytic fibroid," which would have been a benign growth on the outside of Sanghamitra's uterus. However, the radiologist could not "entirely exclude" that the growth seen in the ultrasound was a "right adnexal pathology," in other words, that it could

Sanghamitra, who was a registered nurse, for the first time at 10:21 the following morning, he informed her of his suspicion and recommendation, and told her that he could do the operation that afternoon or she could wait. However, Taylor did not recommend waiting to do the surgery because there was a risk of the cancer growing and he did not believe there was any reasonable alternative to the surgery.

After Taylor explained the alternatives to Sanghamitra, she agreed to have the surgery that day. During the surgery, although Taylor observed multiple fibroids in Sanghamitra's abdomen, including a large one on the top of her uterus, he could not find any gross evidence of obvious cancer when he inspected her ovaries. Nonetheless, due to the high suspicion of ovarian cancer, he was obligated to remove the organs for pathological analysis in order to get a definitive answer as to whether cancer was present because performing a biopsy would risk leaving behind microscopic cancer cells. Thus, Taylor still performed a TAH/BSO and removed the organs.

---

alternatively be a cancerous growth attached to Sanghamitra's adnexa, which were her fallopian tubes and ovaries. A CT scan was also performed, on which the radiologist observed a hanging right-sided mass at the top of the uterus, which he noted was a "probable fibroid" but could not exclude malignancy. Additionally, a urinalysis indicated an elevated beta-HCG level, which could indicate pregnancy or be interpreted as a cancer marker.

After the surgery, although Taylor found tissue that raised suspicion of possible cancerous growths, he determined that Sanghamitra did not have cancer and that the suspected mass was a cervical hydatidiform mole, or a "molar" pregnancy,[4] which was extremely rare and could cause serious complications if untreated, particularly for patients over the age of fifty-five like Sanghamitra. A pap-smear and a tissue specimen retrieved from Sanghamitra and sent to the lab prior to the surgery confirmed a molar pregnancy. However, because Taylor did not request that the lab results be returned on a rush basis, the results were not received until after the surgery.

Although Sanghamitra acknowledged signing an informed consent form authorizing Taylor to perform a TAH/BSO, she claimed Taylor did not advise her of all of the risks of the procedure and that she had the option of waiting to get the lab results back that would have shown she was pregnant. Taylor explained that had he known the lab results prior to surgery, he still would have recommended that Sanghamitra undergo a TAH/BSO because this was a very dangerous location to have an abnormal impregnation and could be life threatening.

---

[4] A molar pregnancy is an abnormal form of pregnancy, in which an egg with no genetic information is fertilized by a sperm but does not develop into a fetus, and instead continues to grow as a lump of abnormal tissue.

A-2334-15T4

Taylor's expert agreed with him and opined that Taylor's treatment was appropriate and within the standard of care for a gynecologic oncologist. On the other hand, Sanghamitra's expert opined that observation would have been the treatment of choice, that Taylor failed to perform an adequate diagnostic workup in order to determine the appropriate treatment of choice, and if Taylor wanted to verify what the mass seen on the radiographic films was, he could have performed an exploratory laparotomy, not a TAH/BSO. Following deliberations, the jury returned a no cause verdict in favor of Taylor on December 17, 2015.

On December 2, 2015, during jury selection, after plaintiffs exhausted all peremptory challenges, a prospective juror stated during voir dire that she was "hesitant" to serve as a juror "because of [her] relationship with [insurance] carriers." The juror specified that she was an attorney and represented Princeton Insurance Company in coverage cases.[5] Although she indicated that, based upon her experience and what she knew about the case, she thought she "could be fair," she also stated that she would have an "allegiance" to her client, Princeton Insurance Company. During a side bar colloquy, defense counsel informed the court and plaintiffs' counsel that defendant's insurance carrier was, in fact,

---

[5] We note that the court also stated during the voir dire that Princeton Insurance Company was "[a] former client of [his]."

Princeton Insurance Company. Plaintiffs' counsel promptly objected and challenged juror number seven for cause, stating that she had a conflict based on the "connection between her client and the defendant in this lawsuit." Plaintiffs' counsel reasoned that although she was unaware of the connection, there was a real danger that it "could come out" during her jury service and predicted that it was "a potential time bomb." The court overruled counsel's objection, stating that "[c]overage issues are handled separate and apart from the other [defense related] issues," and because there was "no coverage issue in this case," there was "no way she could [find] out about it."

Thereafter, the court seated the juror as juror number seven, and an eight-member jury, including juror number seven, was impanelled and sworn. The parties made opening statements and the trial was adjourned until the following day. The following morning, Sanghamitra, the first witness called, began testifying. In a sidebar colloquy, plaintiffs' counsel noted on the record that a Princeton Insurance Company representative had been present in the courtroom observing the proceedings since the start of trial the day before.[6] Later in the day, plaintiffs' counsel noted on the record that it appeared as if juror number

---

[6] On the morning of December 3, 2015, before any testimony was taken, plaintiffs' counsel apparently again objected to the seating of juror number seven. However, the objection was made in a sidebar conference that was not recorded.

seven had recognized the Princeton Insurance Company representative in the courtroom. Although defense counsel had no objection to removing juror number seven to avoid "making it an issue," the court refused "to entertain the issue" at that juncture. Instead, the court indicated that it would have no problem with counsel stipulating to juror number seven serving as an alternate, "assuming we have additional alternates," when "we get to the end of the case."

On the third day of trial, the morning of December 7, 2015, juror number seven sent a note to the court, stating that she "need[ed] to speak to [the court] before the trial proceeds." In a sidebar conference before the court and counsel, but outside the presence of the other jurors, juror number seven informed the court that she recognized the Princeton Insurance Company representative who had been in the courtroom observing the trial each day, and knew that she had a conflict of interest. The court asked whether she had discussed anything with the other jurors, and she replied "[a]bsolutely not."

Plaintiffs moved for a mistrial, arguing juror number seven "may have expressed an attitude or something else" to taint the other jurors. The court acknowledged that it "could always do a taint hearing[,]" but concluded that it was not necessary "in this particular situation[.]" The court denied the application "without prejudice[,]" noting the timing and sequence of events and concluding that the issue had not "risen to that level." The court explained that

juror number seven said she "never said anything to any of [the other jurors]" and, in light of the fact that "[s]he is an attorney" and "obviously . . . an officer of the [c]ourt[,]" the court would "take her at her word." Instead, the court excused juror number seven and explained to the remaining jurors that she was "excused by the [c]ourt for various emergent reasons" that had "nothing to do with the merits of the case" but "simply had to do with other issues" and should not be "consider[ed] in any way, shape or form."

The trial continued for two weeks, after which the jury returned a no-cause verdict in Taylor's favor. The court entered a conforming judgment on December 29, 2015. Plaintiffs moved for a new trial arguing, among other things, that they did not receive a fair trial because of juror number seven's "conflict of interest during the course of her service as a [juror]." On February 5, 2016, following oral argument, the court denied the motion. Specifically, the court reiterated that "[j]uror [n]umber [s]even ultimately recogniz[ing] the Princeton [Insurance] claims adjuster" did not "taint[] or prejudice[] this particular jury" and did not warrant a taint hearing. The court explained "she hadn't spoken with anyone, she hadn't mentioned anything about the case to any of the other jurors, and . . . although she still said . . . she could be fair," the court excused her because it "thought discretion the better part of valor[.]" This appeal followed.

On appeal, plaintiffs argue that "even if juror number seven did not disclose to the other members of the jury her connection to the [d]efendant[,]" the court's "refusal to excuse her as a juror before the trial began deprived the [p]laintiffs of their right to an impartial, unprejudiced jury, requiring reversal of the jury's verdict." We agree.

> The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. A jury is an integral part of the court for the administration of justice and on elementary principles its verdict must be obedient to the court's charge, based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. . . . Therefore, the parties to the action are entitled to have each of the jurors who hears the case, impartial, unprejudiced and free from improper influences.
>
> [Panko v. Flintkote Co., 7 N.J. 55, 61 (1951).]

Generally, "trial court decisions whether to excuse prospective jurors for cause are given substantial deference. They are discretionary decisions which engage the trial judge's superior ability to evaluate the whole person in the courtroom." Catando v. Sheraton Poste Inn, 249 N.J. Super. 253, 258 (App. Div. 1991). While "[t]he reported cases on the subject are mostly criminal cases, . . . . [a] civil litigant is also entitled to an unbiased jury . . . and to responsive jury selection processes." Id. at 259. The trial court's jury selection process must be designed to insure the production of a fair and impartial jury. "A juror

must not only be impartial, unprejudiced and free from improper influences, he or she must also appear to be so." Id. at 261 (citing Wright v. Bernstein, 23 N.J. 284, 294-95 (1957)). "The litigants' confidence in the basic fairness of the trial is an important consideration." Id. at 261-62 (citing State v. Jackson, 43 N.J. 148, 160-61 (1964)). "If a party's reasonable apprehension of unfairness can be avoided without injuring the rights of others, a sound exercise of judgment favors excusing a juror." Id. at 262.

To that end, we adopted the rule in civil cases that when "a challenge for cause is erroneously denied" after "all peremptory challenges have already been exhausted, and the challenged juror therefore sits, the error requires reversal . . . ." Id. at 264-65. "[P]rompt raising of the problem, while the judge still has the capacity to deal with it, insures that avoidable error does not inadvertently creep in to the proceedings" and "avoid[s] later disputes over the question of what objections were actually brought to the court's attention." Id. at 265.

Additionally, because "securing and preserving an impartial jury goes to the very essence of a fair trial[,]" id. at 258-59, "the court has an independent duty to act swiftly and decisively to overcome" potential bias. State v. Williams, 93 N.J. 39, 63 (1983). When evidence of juror bias is presented, "[t]he court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors

have been tainted thereby." State v. R.D., 169 N.J. 551, 558 (2001) (citing Pressler, Current N.J. Court Rules, cmt. 2 on R. 1:16-1 (2000)). If actual juror taint is possible, the trial court must voir dire the affected juror and, in appropriate circumstances, the remaining jurors. State v. Bisaccia, 319 N.J. Super. 1, 13 (App. Div. 1999).

> An appropriate voir dire of a juror allegedly in possession of extraneous information mid-trial should inquire into the specific nature of the extraneous information, and whether the juror intentionally or inadvertently has imparted any of that information to other jurors. Depending on the juror's answers to searching questions by the court, the court must then determine whether it is necessary to voir dire individually other jurors to ensure the impartiality of the jury. That determination should be explained on the record to facilitate appellate review under the abuse of discretion standard. But the decision to voir dire individually the other members of the jury best remains a matter for the sound discretion of the trial court. No per se rule should obtain. The court may learn through its questioning of the excused juror that circumstances made it impossible for that juror to impart impermissible information to the other jurors even unintentionally. Although the court should not simply accept the juror's word that no extraneous information was imparted to the others, the court's own thorough inquiry of the juror should answer the question whether additional voir dire is necessary to assure that impermissible tainting of the other jurors did not occur. In some instances, the court may find that it would be more harmful to voir dire the remaining jurors because, in asking questions, inappropriate information could be imparted.

[R.D., 169 N.J. at 560-61.]

"The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary." R.D., 169 N.J. at 558. Any "improper intrusion into the deliberations of a jury that 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge' is a ground for a mistrial." State v. Hightower, 146 N.J. 239, 266-67 (1996) (quoting Panko, 7 N.J. at 61). The decision to grant or deny a motion for a mistrial is addressed to the sound discretion of the trial judge. State v. Winter, 96 N.J. 640, 647 (1984). Likewise, "[t]he decision to grant a new trial based on jury taint resides in the discretion of the trial court[.]" R.D., 169 N.J. at 558. The test for determining whether a new trial will be granted

> is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so. The stringency of this rule is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices.
>
> [Panko, 7 N.J. at 61-62.]

However, a new trial "is not necessary in every instance where it appears an individual juror has been exposed to outside influence." R.D., 169 N.J. at 559.

> Ultimately, the trial court is in the best position to determine whether the jury has been tainted. That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings. The inquiry about whether extraneous information had the capacity to influence the result of the jury requires an examination of whether there was at least an opportunity for the extraneous information to reach the remaining jurors when that extraneous information is knowledge unique to one juror who is excused mid-trial.
>
> [Ibid.]

See also State v. Wormley, 305 N.J. Super. 57, 70 (App. Div. 1997) (finding that even though excused juror stated she did not discuss extraneous matter with anyone, there was a "strong likelihood that, even indirectly or unintentionally, she may well have," given that there was at least one break during which jurors commingled informally).

Here, we are convinced that during jury selection, the court erred in not excusing juror number seven for cause after plaintiffs' peremptory challenges were exhausted and after the court became aware of juror number seven's

conflict of interest. Given her admitted allegiance to her client, Princeton Insurance Company, it is of no moment that, unlike the court and counsel, juror number seven was unaware of the actual conflict during the initial voir dire. We also believe the court's voir dire of juror number seven after she became aware of the actual conflict was inadequate to determine whether questioning the other jurors was necessary. Despite juror number seven's response that she did not discuss anything with the other jurors, the court failed to probe whether she had inadvertently imparted any information to the other jurors, but simply accepted her word that no extraneous information was imparted to the others. Without a thorough inquiry of juror number seven, the court could not properly determine whether additional voir dire was necessary to assure that impermissible tainting of the other jurors did not occur.

On appeal, plaintiffs also argue that the verdict was against the weight of the evidence, that the jury charge on informed consent was incorrect, and that defense counsel's cross-examination of Sanghamitra was improper. However, in light of our disposition on the juror bias issue, we need not address plaintiffs' remaining arguments.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2334-15T4